**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 04-03160-01-CR-S-FJG |
| JIMMIE D. POE, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Defendant has filed a Motion to Suppress in which he alleges that all evidence seized at his residence on November 12, 2004, should be suppressed. The United States filed its response. The matter was set for an evidentiary hearing, which was held before the undersigned on June 14, 2005. The defendant was present with counsel, David Mercer, Assistant Federal Public Defender, and the United States was represented by Christopher Nielson, Special Assistant United States Attorney.

It is defendant's position that the entry in his residence and the search that followed were made without a warrant and without any recognized exception to the warrant requirement. Therefore, he contends that the Court should suppress any and all evidence, including any statements made by defendant, that were seized as a result of the warrantless entry, search, and seizure of his residence.

The first witness for the government was Daniel Graham of the Ozark Police Department. On November 12, 2004, he was dispatched to 1309 S. 3rd Avenue, Ozark Missouri, at about 10:00

1

a.m. based on a report of a possible stolen vehicle parked behind a duplex. He talked to some neighbors from a nearby duplex, who said defendant had been removing items from the back of a pick up truck and taking them inside his duplex. The truck was parked in the grass behind the duplex. Upon checking the license plate, Officer Graham discovered it was the stolen vehicle. He then spoke to another neighbor in another duplex. She indicated that the subject was probably home. He attempted to make contact with the person in the duplex. He started out by knocking and then knocking and announcing his presence, which is standard procedure. Officer Northcutt was also there, and went to the back of the residence. Officer Stafford arrived while Officer Graham was knocking. He estimated that he knocked for 10-15 minutes. Officer Northcutt attempted to contact him from the back of the duplex, but their radios weren't working and all he could hear was static. He could not see inside the windows. He could hear commotion in the back, but couldn't see anything. Prior to the door being opened, he was concerned for himself because of dealing with a felony. Defendant then came to the door, and did not make any statement. He did open the door to the duplex, and stood back and basically looked at the officer. Officer Graham felt that, at that point, defendant was giving himself up. He placed defendant in handcuffs and read him his Miranda rights by using a printed card. Defendant stated that he understood, and that he was willing to speak to the officer. Defendant stated that someone had brought the stolen vehicle to him, without giving any names. Immediately upon entering, the officer could see a shot gun on an end table, which was ten feet or less from the entry way. The officer asked where the weapon came from. Defendant stated it was from the vehicle. Officer Graham asked defendant if he was a felon, and he admitted that he was. The officer conducted a search of defendant's person, finding the keys to the truck in a pocket. When he ran a check on defendant's identity, he discovered that he had an outstanding

2

warrant for a parole/probation violation. Before he took defendant into custody, the officer testified that he was concerned for his safety, and for the loss of evidence.

On cross examination, the witness testified that there were three officers at the scene at the end of the incident. He was the only one who wrote a report. He assumed there would be items in the residence that had been taken out of the vehicle. Officer Stafford was at the back of the residence with Officer Northcutt. Regarding what he heard, he stated that he heard "commotion," which he described as static and unreadable radio traffic. [Tr. 13]. Then he heard yelling at the back of the residence. Before the door was open, he did not hear or see anything inside the residence. He talked to several neighbor, one in the duplex itself and two others at a neighboring duplex. One neighbor said defendant was probably home. The other two said they had seen him carrying things from the vehicle and taking them inside just prior to the officers' arrival. Before they got inside, they had no specific knowledge about a weapon being inside. Regarding officer safety concerns, although Officer Graham stated that he is always concerned with a felony arrest, in this case, he was concerned because there was a stolen vehicle hidden behind defendant's residence. There were no other vehicles around, and the truck was close to the back of the duplex. At that point, that was the only thing that caused him specific concern about his safety. Also, any time commotion is heard in such a situation, it causes concern. At the time he heard the commotion, three officers were there. He admitted that one of them could have gone to get a warrant, although he felt it would have taken several hours. Regarding asking for consent, he admitted that they never asked for consent to go inside. Defendant did not grant verbal consent. He could not remember if defendant demanded a warrant, and did not think it was even discussed. Prior to entering the home, he did not know who was inside, and did not discover until later that defendant was a felon. Regarding his concern about

3

the loss of evidence, he admitted he did not have specific information that there was evidence inside that needed to be protected, and nothing to suspect that evidence was being destroyed at that time. He had not heard or observed anything that specifically made him concerned about officer safety, other than the fact that it was a felony contact. There was nothing specific to this situation. The officer testified that defendant opened the door widely, and by his facial expression and actions, he was essentially saying that "this is over, come on in." [Tr. 21].

Regarding Officer Graham's written report, he admitted that it did not say anything about other officers seeing defendant with a gun, does not mention officer safety or concern for destruction of evidence, and does not say how long he knocked.

On redirect examination, Officer Graham reiterated that he was concerned when he heard the commotion, concerned about the proximity of the stolen vehicle to the residence, concerned when he heard that defendant was probably in the residence, and concerned when he continued to knock and did not get a response. Sometimes, this means that they have someone barricaded. Regarding his report, he was not trying to hide anything in the report, but rather, just included the facts.

On recross, it was the officer's testimony that he only had static on his radio. He knew the other officers were trying to contact him, but he did not know what they were saying. The neighbors were in the vicinity for a brief time, and then were told to go into their duplexes. Upon questioning by the Court, the officer stated that he heard the yelling at about the same time that he heard the static.

The officer was asked if he could hear who was yelling. He stated that he could not. Officer Stafford did come around the side of the duplex at that time, but Officer Graham did not remember
4

what he said or if he mentioned a firearm. At that time, the officer was more focused on the door being opened, going inside, and seeing how many people were inside.

The second witness for the government was Kane Northcutt, who is employed by the Ozark Police Department. He assisted Officer Graham in investigating the stolen vehicle. When they arrived there, he went around to the back of the duplex, and peered in the back glass window. There was nothing to impede his ability to see inside. He could see defendant peeking out the window in one of the bedrooms facing the front, looking towards Officer Graham, who was in the front. Officer Northcutt knocked on the sliding door "pretty hard," and said, "open the door or we'll break it." [Tr. 28]. Defendant turned around, looked at the officer, and then picked up a long gun off the bed. Once Officer Northcutt saw this, he hollered on his radio that the suspect had a gun, and told Officer Stafford the same thing. He grabbed his duty firearm, then looked to see if he could see defendant, and he was gone. He did not have any contact with defendant until after he was placed in custody. Officer Northcutt was concerned about his safety, as well as the safety and well-being of other individuals.

On cross examination, Officer Northcutt testified that he was peering into the back of the house at the same time that Officer Graham was at the front of the house. Officer Graham knocked for about ten minutes after they saw the stolen truck. He thought they started knocking after the neighbors said defendant was inside. He admitted that they did not have a warrant. He was at the side of the house, peeking through the door, with his face up against it. For his safety, he put himself against the wall in case shots were fired. He did not know if he could have seen from further back. He acknowledged that they were there to investigate a stolen truck. There were two entrances to the duplex, and there were officers at both. He tried to radio to Officer Graham, and did not have

5

a way to confirm that he heard him. Officer Stafford told him that he ran around the side of the duplex and told Officer Graham about the gun. Officer Northcutt did not observe anything that appeared to be the destruction of evidence. He took his weapon out of the holster, but did not believe anyone inside could see that. When he commanded that the door be opened, he said this loudly He did not ask for consent to enter the residence from anyone. Prior to the entry, he did not receive any communication that gave them permission to enter. Before they entered, they did not know who was inside or that he had a felony conviction, but neighbors said he was inside.

Defendant called Amanda Markle to the stand. She lived next to the duplex at 1311 S. 3rd Avenue. At the time of this incident, it was her testimony that the officers kept asking defendant to open the door. They said they were going to come in if he didn't open the door. Then the officers opened the door and went inside defendant's duplex.

On cross examination, the witness testified that she was in her driveway when this happened. She thought she was about 15 feet away when she saw the officers open the door.

An exception to the warrant requirement permits a law enforcement officer to enter and search a home if he acts with probable cause and exigent circumstances exist. Anderson v. Creighton, 483 U.S. 635, 641 (1987). Probable cause exists when it is reasonable to believe contraband or illegal activity will be found in a particular place. Kleinholz v. United States, 339 F.3d 674, 676 (8th Cir.2003). Exigent circumstances, although typically limited to situations where a life is threatened, a suspect's escape is imminent, or evidence is about to be destroyed, United States v. Ball, 90 F.3d 260, 263 (8th Cir.1996), may also be found when there is a compelling need for official action and there is no time to secure a warrant. Michigan v. Tyler, 436 U.S. 499, 509 (1978). A determination of whether a legal warrantless entry occurred

6

focuses on whether a law enforcement officer acted with a reasonable belief that probable cause and exigent circumstances existed, not on whether either actually existed. Anderson, 483 U.S. at 641. In this case, having fully reviewed the evidence, the Court finds that the warrantless entry into defendant's home comports with the exception to the warrant requirement, and it was therefore legal. Initially, probable cause existed because it was reasonable for the officers to believe illegal activity was taking place after the officers responded to a report of a stolen vehicle, and observed a truck in the back of defendant's duplex, which they verified was stolen. Exigent circumstances existed because of the felony having been committed, the current information that defendant was probably inside the duplex, the fact that the officers knocked for at least ten minutes and defendant did not respond, and Officer Northcutt's observation that defendant had a gun in his possession and was looking out the window towards where Officer Graham was positioned. The Court finds that these conditions created a threat to officer and public safety. Michigan, 436 U.S. at 509. Officer Northcutt testified that he saw defendant with a weapon, and he tried to radio Officer Graham with this information. That effort of contact by radio failed, but it was his testimony that Officer Stafford ran around the duplex and told Officer Graham that defendant had a weapon. It was Officer Graham's testimony that, in the heat of the moment, he was not sure what Officer Stafford said. He was sure, however, that an effort was being made to contact him by radio, and that, at the same time he could hear commotion, which he described to include yelling, from the back of the duplex. Based on the information available to the officers on the scene, the Court finds that it would have been unreasonable to subject the officers or the public at large to undue risk by requiring the officers to secure both the residence and the stolen truck during the period of time it would have taken to obtain a warrant. Thus, it

7

must be recommended that the motion to suppress be denied because the Court finds that the officers acted on a reasonable belief that probable cause and exigent circumstances existed.

Defendant contends that based on the testimony at the hearing, particularly that of Officer Northcutt, the first invasion of privacy occurred when that officer pressed his face to the glass and looked inside defendant's home. Given that his purpose was to look inside, it is asserted that this violates the Fourth Amendment. Defendant relies on Payton v United States, 445 U.S. 573 (1980), which holds that warrantless arrests made in a home are not valid except for exigent circumstances.

Regarding defendant's contention that Officer Northcutt violated his Fourth Amendment rights by peering inside the house, the Court finds this argument to be unpersuasive. Based on the officer's testimony and his description of positioning himself close to the house for defensive reasons, as well as for the purpose of observing if defendant was inside, the Court finds that his actions were reasonable. The officer's mere observation of defendant with a gun in plain view through the window did not implicate any Fourth Amendment rights, given that it was not a search. Rather, in this case, as previously discussed, exigent circumstances existed because of the felony having been committed, the current information that defendant was probably inside the duplex, the fact that the officers knocked for at least ten minutes and defendant did not respond. The circumstances already known to the officers, justified peering through the window. See United States v. Gill, 354 F.3d 963 (8th Cir. 2004).

It is also clear that the collective knowledge of all the officers involved in the investigation is relevant to determining whether there was probable cause to make an arrest or

8

search.  See  United States v. Horne, 4 F.3d 579, 585-86 (8th Cir. 1993), cert. denied, 510 U.S. 1138  (1994); United States v. Morgan, 997 F.2d 433, 435-36 (8th Cir. 1993).   In this case, the officers were all aware of the report of a stolen vehicle, and they were working in close proximity to each other at the scene, responding to rapidly unfolding events.  There was reason to believe that there was a risk of flight and potential risk of danger to the officers and citizens in the neighborhood.   Exigency must be judged situation based on the facts and circumstances known to the police at the time of the search. See United States v. Cooper, 168 F.3d 336, 339 (8th Cir.1999).  In this case, the Court finds that the officers acted properly, and that exigent circumstances justified their actions.  It should be noted, finally, that Ms. Markle's testimony that she thought she saw the officers enter the duplex without defendant opening the door was based on her observation from the driveway at a distance of at least 15 feet.  Given that the officer was in a better position to observe what actually occurred, the Court finds that the more credible testimony is that defendant opened the door and permitted the officers to enter.

Based on the foregoing, the Court finds that it must be recommended that defendant's Motion to Suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 22 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence be denied.

         /s/ James C. England
         JAMES C. ENGLAND
         United States Magistrate Judge

Date: 7/1/05